(No. 27330.—

The Ohio National Life Insurance Company *et al.*, Appellees, *vs.* The Board of Education of Grant Community High School District No. 124, Appellant.

*Opinion filed May 16, 1944—Rehearing denied September 14, 1944.*

160

B. F. LANGWORTHY, of Chicago, for appellant.

HOLLAND M. CASSIDY, SCHROEDER & SIMPSON, WERNER W. SCHROEDER, THEODORE W. SCHROEDER, all of Chicago, and A. F. BEAUBIEN, of Waukegan, for appellees.

Mr. JUSTICE MURPHY delivered the opinion of the court:

This is an appeal from judgments entered in the circuit court of Lake county. The legal questions submitted arise out of the facts surrounding the issuance of fifty-four bonds of $1000 each by the Board of Education of Grant Community High School District No. 124 of that county. It is the same issue of bonds, the validity of which was considered in connection with certain validating acts in *People ex rel. Morse* v. *Orvis,* 358 Ill. 408, and *People ex rel. Leaf* v. *Orvis,* 374 Ill. 536. The questions in those cases arose on a taxpayer's objection to the taxes which had been levied to pay interest on the bonds in question. The Ohio National Life Insurance Company held thirty-three of these bonds and started this suit May 8, 1941. Pleadings filed by the board of education brought Leslie C. Small and May Small Inglesh, who collectively held fifteen bonds and Unity of Bohemian Ladies, who held six, into the action as parties defendants to its counterclaim. After a trial before the court without a jury, judgments were entered in favor of the holders proportionate to their respective interests in the bonds. The board appealed to the Appellate Court. On the motion of a part of the bondholders, the cause was transferred to this court on grounds

that a constitutional question was involved. The jurisdictional fact arises out of the bondholders' claim that they were not parties to the tax objection suits (the two *Orvis cases*) and that the holding of this court in the last of those cases, that the act of 1935 was invalid, is not conclusive against them. The board of education contends that under the doctrine of *res judicata* the holding in the tax objection suit that the act of 1935 was invalid, and that the bonds in question are void, is conclusive against the bondholders in this case.

The conclusion has been reached that by the application of well-established principles, the opinions filed in the two *Orvis cases* are not *res judicata* as to the holders of the bonds and that, therefore, the validity of the 1935 validating act will have to be reconsidered in the light of the claims of the new parties, the new facts presented and the argument advanced in support thereof.

It was stipulated that the parties waived the necessity of formal pleadings but the bondholders' theory of their right of recovery will be better understood if a brief outline of the six counts of the complaint is set forth. The factual background as pleaded in the first count, and incorporated into some of the others by reference, shows that on February 16, 1931, the board of education adopted a resolution authorizing the execution and sale of fifty-five bonds of $1000 each and made provision therein for annual levies sufficient in amount to meet the semiannual interest payments and the principal of the bonds as they matured. The interest was payable March 1 and September 1 of each year. Four of the bonds were to mature September 1, 1941, and five September 1 each year thereafter, to and including September 1, 1952. When this suit was filed, all interest which had become due on and prior to September 1, 1939, had been paid.

The first count sought a recovery of the interest becoming due in 1940 and 1941. It was alleged that, pursuant to

the resolution authorizing the issuance of the bonds, taxes had been extended annually and that there was sufficient money in the hands of the school treasurer to pay the interest becoming due in 1940 and 1941. The prayer was that a writ of *mandamus* issue commanding the school officials to pay such interest from the money so collected. The second count differed from the first in the relief asked, in that it alleged that prior to the suit the school officials had repudiated liability on the bonds, and that the county clerk would not extend taxes pursuant to the resolution adopted February 16, 1931. They prayed for a writ of *mandamus* to compel the county clerk to extend the tax in accordance with said resolution. The third count was premised on substantially the same facts as the first and alleged that the school officials had refused to make further payments of interest or principal on the bonds and were threatening to use the money collected for other purposes. The prayer was for an injunction to enjoin such misappropriation of the moneys collected. In the fourth count it was alleged that the board of education had repudiated liability for interest becoming due in 1940 and 1941 and disaffirmed the liability for principal on the bonds maturing September 1, 1941, and that, therefore, all other bonds had become due and payable at once, notwithstanding the date of later maturities as contained in the bonds. The prayer was for a money judgment. The fifth was for money had and received and the sixth for equitable subrogation. It was predicated on an alternative, namely: if the bonds were held invalid then the holders of the same should be subrogated to the rights of the creditors of the defendants whose claims had been paid from the proceeds of the bonds.

The board of education filed an answer and counterclaim. The board asked for a recovery of the money paid to the bondholders as interest during the years 1931-1939, inclusive. It was further alleged that the annual levies had produced more than was necessary to meet the annual pay-

ments of interest and that these balances for the several years 1931-1939, and the amounts levied for the years 1940 and 1941 to include interest and principal, the aggregate of which was about $12,000, were in the treasury of the school district and that the Life Insurance Company was making demands, which if allowed, would give it priority over the Smalls and the Unity of Bohemian Ladies, and, therefore, asked that there be an adjudication as to the disposition of such fund.

By the judgments appealed from the court held the bonds void and dismissed counts 1, 2 and 3 of the complaint but found that the bondholders were entitled to recover and entered judgments as follows: The Ohio National Life Insurance Company, $32,422.50, the Small interests collectively, $14,737.50 and Unity of Bohemian Ladies, $5895. The counterclaim was dismissed. The theory adopted by the trial court was that the school district was liable for money had and received, or as equitable subrogees for the amounts represented by the bonds held by the respective holders thereof. The bonds provided for interest at $5\frac{1}{2}$ per cent per annum, but the bonds being void, the court fixed the interest at 5 per cent and after allowing credit for interest previously paid on the higher rate as fixed by the bonds, the judgments were entered for the amounts stated.

The Ohio National Life Insurance Company and the Smalls will be referred to as plaintiffs. The Unity of Bohemian Ladies have not followed this appeal. The board of education will be designated as defendant.

Defendant seeks to invoke the doctrine of *res judicata* against plaintiffs' claim by applying the principles announced in *People* v. *Orvis,* 374 Ill. 536. The conclusions reached in that case, which defendant now seeks to assert against plaintiffs, were that the validating act of June 6, 1935, was unconstitutional and that the bonds which are in question were illegal and did not furnish a proper basis for a

tax levy. The principle that underlies the doctrine of *res judicata* is, that the court will not relitigate a matter which has been previously determined in an action between the same parties. It is a fundamental principle of law that controls the application of said rule that one is not bound by a prior judgment if he was not a party to such action or does not stand in the relation of privy to one who was a party.

Plaintiffs were not parties to either of the *Orvis cases* and the interests represented in those cases by the county collector and the taxpayer were not such as to support the principle that representation of one of a class is sufficient to bind all members of the class. The objecting taxpayer, whose property was assessed to raise money to pay plaintiffs' bonds had an interest decidedly adverse to plaintiffs and the county collector was but an agency named by law to collect the tax. Nor can it be said that plaintiffs were in privity to the county collector. In *People ex rel. Graff* v. *Chicago, Burlington and Quincy Railroad Co.*, 247 Ill. 340, in discussing a similar question it was said: "Where a right is asserted against a municipality and a judgment is recovered it is binding on taxpayers although they are required, as individuals, to pay the judgment, but a decree enjoining the collection of a tax to pay a demand against a town in a suit by taxpayers against the town is not *res judicata* against the holder of the demand who is not a party to the suit. * * * The interest of the holder of the demand is adverse to that of the town and the taxpayers, and he is not represented by either in a litigation between them." Also see *Worley* v. *Idleman*, 285 Ill. 214, and *Town of Lyons* v. *Cooledge*, 89 Ill. 529. The principles announced in the last of the *Orvis cases* can not be invoked against the plaintiffs by application of the doctrine of *res judicata*.

There is another state of facts by which plaintiffs seek to reverse the application of the rule of *res judicata* and

make a judgment of the Federal district court binding on defendant. In June, 1936, the insurance company obtained a judgment in the Federal district court against defendant for $3025. It represented the interest on bonds owned by the plaintiff which had matured prior to that date and remained unpaid. Defendant filed an answer. The issues, as raised by the pleadings, show that the insurance company relied upon the validating act of June, 1935, in support of its claim that there was interest due on its bonds. But from the pleadings of that case, appearing as evidence in this action, it does not appear that any question was raised as to the validity, construction or application of said validating act. The judgment entered permitted a recovery upon the assumption that the act was valid. As pointed out in the opinion in the later *Orvis case,* the Federal court was not the forum where the constitutionality of the validating act could be finally determined. It was held that the final determination of such questions was for the State courts and we now adhere to the holding in that case.

In applying the doctrine of estoppel by judgment, the distinction has been made between the finality of a judgment as a bar or estoppel where the second demand is for the same cause of action and between the same parties or their privies as the former action and those cases where the second action is between the same parties but upon a different claim or cause of action. If the action is of the former class, the judgment operates as an estoppel, not only as to every matter actually litigated in such action but extends to all grounds of recovery or defense which might have been presented. (*Harding Co.* v. *Harding,* 352 Ill. 417; *Markley* v. *People ex rel. Kochersperger,* 171 Ill. 260.) If the action between the same parties is of the latter class, that is, upon a claim or demand different from the one litigated in the first action, then the parties are estopped only as to those matters in issue or points con-

troverted in the former action and the determination of which formed the basis of the judgment. (*Harding Co.* v. *Harding,* 352 Ill. 417.) In the action in the Federal court, the validity of the bonds or the validating act was not made an issue. The sole question was as to the liability for interest for the period in question and this liability was adjudicated upon the assumption that the validating act was valid. Under the circumstances shown, the judgment of the Federal district court is not *res judicata* against defendant's contention that the bonds are illegal. It would be binding only as to the amount of interest which defendant paid by satisfying the judgment in full. In defendant's counterclaim it seeks recovery for all interest paid, but as to the amount of the Federal district court judgment for $3025, that is final and conclusive against defendant and will be so treated in considering defendant's counterclaim on that matter.

The facts are not in dispute. In December, 1929, a special election was held in the district which authorized the purchase of a building site, the construction of a school building and the issuance of bonds to the amount of $72,000. No question is raised as to the validity of the election and this issue of bonds is not involved. The bonds were sold, a site purchased, and a contract let for building and equipment.

On February 16, 1931, defendant adopted a resolution authorizing issuance of the bonds in question. It was stated in the resolution that the district had, outstanding and unpaid, binding and subsisting legal obligations and no funds for the payment of the same and for the purpose of funding said indebtedness the bonds were authorized to issue. The bonds were dated March 1, and were sold to H. C. Speers and Sons Company, May 14. The whole proceeding was carried through without calling an election and after the bonds were sold the proceeds were used to pay fifty claims aggregating $54,000,

It is agreed that of said total, $27,253.63 was contracted for building purposes and $25,790.05 for educational purposes. The parties are agreed as to the classification of claims as between building and educational purposes, except as to eight totaling $5144.79. Of the total of the sum of $27,253.63, there was $8914.51 of that amount contracted before the statutory limit had been exceeded. One of the eight claims in dispute as to classification was for the payment of a special assessment lien against defendant's property. This was incurred February 3, 1930, before the statutory limit for indebtedness had been exceeded. Proceeds of the bonds were used in its payment to the village of Fox Lake in the amount of $1787. This was properly chargeable to the building fund, and having been contracted prior to the time when the statutory debt limit had been exceeded, it should be added to the other total of $8914.51, thus making a total of $10,701.51. The other seven claims appear to have been incurred after the debt limit had been exceeded and, under the views hereinafter expressed, it would be of no consequence whether they be classified under the educational or building fund. For the purpose of carrying the total, they will be classified as building-fund claims. This computation leaves $16,552.12 of claims contracted after the debt limit had been exhausted. It was agreed that the item of $25,790.05, chargeable to the educational fund, was within the annual educational tax levy when incurred.

The total assessed valuation of all taxable property in the district for 1930, which was the valuation that controlled when the bonds were issued, was $3,206,252. During the years 1929 and 1930, there had been the regular levy for building and educational purposes. A summary of the building-fund account shows the total cost of the building was $142,618.74. Of this amount $115,305.11 had been paid on the day the bonds in question were sold. The money for such payment was derived from the

sale of the first bond issue, $72,000, and the annual levies for 1929 and 1930 for building and educational purposes. There remained unpaid on said date the sum of $10,701.51, which, as previously stated, was incurred before the debt limit had been exceeded, $16,552.12 contracted thereafter, plus the amount necessary to replenish the educational fund, $25,790.05.

It is agreed that the total credit available for building purposes, had statutory limits been observed and the annual tax levies applied, would have been $97,170.41, thus making the cost of the building exceed the available credits in the sum of $45,448.33.

The details of the receipts, expenditures for building purposes and the amounts drawn from the educational fund and used for building purposes did not appear in the record of either of the *Orvis cases*. In the first *Orvis case*, it was said that it was virtually conceded that all the claims totaling $54,000 were incurred for building purposes at a time when the statutory limit had been exceeded. This is the principal difference in the facts between the record presented in the last *Orvis case* and the present case.

Section 195 of the School Law (Ill. Rev. Stat. 1943, chap. 122, par. 218,) authorizes a board to borrow money and issue bonds to build a schoolhouse or repair one, provided the proposition has been first submitted to the voters of the district and has received a majority of all the votes cast on such proposition. As has been stated, the defendant made no attempt to comply with such requirement. In the first *Orvis case*, it was contended that the act of April 30, 1931, (Cahill's Rev. Stat. 1933, chap. 122, par. 446(10),) obviated the necessity of such an election. It was held that the act did not either expressly or by implication purport to authorize an issue of bonds without a vote of the people. Reference to the title of the act and the language used clearly shows that no other conclusion could have been drawn from it.

In the first *Orvis case*, it was also held that the act of April 30, 1931, did not authorize a board of education to increase the indebtedness of the district beyond the statutory limit of 2½ per cent and then to proceed to provide means for its payment either by tax levy or a bond issue. In this connection it was said: "Analyzing the terms of the 1931 act, it is readily perceived that the statute would apply where the board anticipated the need of funds for a lawful purpose and provided for a bond issue in advance of incurring any debt beyond the statutory limit. It is equally manifest that the authority to issue bonds in excess of the 2½% limit 'for any purpose now authorized by law' does not authorize the issue of bonds to pay claims in excess of the statutory limit. Their payment was not a purpose authorized by law." No reason is advanced which warrants a departure from the construction of said act as given in this case and followed in the second *Orvis case*.

We need only to apply such construction of the act to the facts in this case which, as has been pointed out, differ in some material respects from the facts in the prior cases. It was conceded in the tax-objection cases that the whole of the $54,000 of debt was incurred after the statutory debt limit had been exceeded. Accordingly, it was held that the whole issue of bonds was in the same category and that, there being no legal indebtedness to support them, the bonds were illegal. In this case it was proved that $10,701.51 of the total claims was incurred before the debt limit had been reached. This raises questions not considered in the *Orvis cases*, the first of which is, may a bond issue, a part of which was within the statutory debt limit and a part without, be divided and the part that was within the limit be held valid? No case has been cited where the statutory debt limit had been exceeded under the circumstances stated, but there are cases where the constitutional debt limit had been so exceeded. The similarity of the

language used in the constitutional provision and the statute makes the holdings in those cases persuasive in this case. Section 12 of article IX of the constitution prohibits the municipalities therein named from becoming indebted "in any manner or for any purpose to an amount, including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property" etc. Section 1, (Cahill's Rev. Stat. 1933, chap. 120, par. 362(2),) as it applies to school districts such as this, prohibits districts from becoming "indebted in any manner or for any purpose to an amount including existing indetedness in the aggregate exceeding two and one-half (2½) per centum on the value of the taxable property therein" etc.

In *Culbertson* v. *City of Fulton,* 127 Ill. 30, the constitutional limit was considered. The debt incurred was $11,619 while the constitutional limit was $10,453.05, thus the indebtedness exceeded the constitutional limit by $1165.95. It was said, "The indebtedness, however, can only be regarded as void to the extent of the amount of the excess over the constitutional limit. Up to and under that limit, the indebtedness is valid. The inhibition operates upon the indebtedness and not upon the form of the debt." Also see *Mix* v. *People ex rel. Pierpont,* 72 Ill. 241, *Baltimore and Ohio Southwestern Railroad Co.* v. *People ex rel. Gaston,* 200 Ill. 541, and *McPherson* v. *Foster,* 43 Iowa, 48, 22 Am. Rep. 215. Construing the statute in the light of these decisions, the bonds in question to the amount of $10,701.51 were valid if failure to observe the statutory requirement, that authorization must come from an affirmative vote of the people of the district, has been validated by the curative acts hereinafter considered.

The claims totaling $25,790.05, paid from the educational fund, thereby leaving unpaid claims of that fund to be satisfied out of the proceeds of the bond issue, also require separate consideration. It appears that debts in said amount were contracted for building purposes but paid

from the educational fund. When the total of unpaid claims against the district was computed preparatory to adopting the resolution of February 16, 1931, there were included in such total, claims aggregating $25,790.05. It is conceded these claims were properly payable from the educational fund and should have been paid from that fund had it not been for the earlier diversion of a part of the fund to the payment of claims for building purposes. To present the full factual background, it was stipulated that the claims for educational purposes were well within the annual tax levy for educational purposes. From the facts shown, it is evident the educational fund was operating on a cash basis and, had it not been for the misappropriation, there would have been sufficient money available in the educational fund to pay the claims in the sum of $25,790.05. Under such circumstances, the stipulation as to the annual levy for educational purposes is immaterial. The status of the statutory limit when the original claims were contracted for building purposes is the factor that controls here, and in determining whether the said sum of $25,790.05 was incurred within or without the statutory debt limit, reference must be made to the status of the statutory debt limit when these debts for building purposes were incurred. The evidence shows that on March 18, 1930, the debt limit for building purposes had been exceeded and three claims aggregating $29,521 were beyond the statutory limit for incurring indebtedness for building purposes. During the interim between March 18, 1930, and the adoption of the resolution of February 16, 1931, one of the three claims was paid in full but there remained unpaid on the other two a total of $4010. From these facts it appears obvious that the indebtedness of the district was in excess of the statutory limit for at least one year prior to the adoption of the resolution. The date on which the claims for building purposes were incurred, which claims were later paid from the educational fund, is not shown, but since the gen-

eral contract for the building was not awarded until March 10, 1930, it would appear that the building-purpose claims were contracted following March 18, 1930, and at a time when the statutory debt limit had been exceeded. Such claims were therefore invalid and the bonds issued to repay the educational fund were, under the circumstances shown, also invalid. The further claims incurred for building purposes, totaling $16,552.12, incurred after the debt limit had been exceeded, were invalid.

On May 1, 1933, the General Assembly passed a so-called validating act. (Cahill's Rev. Stat. 1933, chap. 122, par. 446(13).) The pertinent parts of section 1 are, that "in all cases where the governing body of any school district heretofore shall have issued bonds for the purpose of refunding maturing principal or interest, or both, of its bonds which were valid and legal obligations of said district or has issued bonds for the purpose of funding and paying orders issued for the wages of teachers, * * * with or without an election, and the bonds and interest coupons so refunded or the teachers' orders or legal claims so funded, have been paid and canceled, each such refunding or funding bond issue is hereby validated and recognized as a valid and binding obligation of the school district issuing the same." This section was also considered in the first *Orvis case* and it was there held that the phrase "for the purpose of funding and paying * * * legal claims" limited the application of the section of the statute to legal and valid claims and that inasmuch as the total indebtedness for which the proceeds of the bonds were to be used had been incurred in excess of the statutory limit, the bonds were illegal and the statute could not be applied. Again noting the distinction between the facts presented in that case and the instant case, it follows that the claims aggregating $10,701.51 for building purposes, which were incurred before the debt limit had been exhausted, were

validated by the validating act of May, 1933. Under principles announced in *People* v. *Orvis,* 374 Ill. 536, it was within the power of the General Assembly to cure the defect arising out of the failure to call an election authorizing the issuance of the bonds.

After the opinion in the first *Orvis case* was filed, the General Assembly passed the so-called validating act of June 6, 1935. (Ill. Rev. Stat. 1937, chap. 122, par. 406y.) In the second *Orvis case* it was considered and held unconstitutional. Plaintiffs ask for a reconsideration of that case on the question of the constitutionality of said act and to now hold it constitutional. It directed that "Whenever any person, firm, or corporation shall have rendered service or furnished materials to any school district for the corporate purposes of the district and such services or materials shall have been paid for by or out of the proceeds of bonds issued by such school district with or without an election, and the amount of the claims for such services or materials, together with other indebtedness, exceeded in whole or in part two and one-half per cent (2½%) of the assessed value of taxable property of the district at the time such services were rendered or materials furnished, the issuance of such bonds shall be deemed a validation of such claims insofar as said claims, together with other indebtedness, did not exceed five per cent (5%) of such valuation at the time they were incurred and at the time such bonds were issued." It will be observed that the part of the statute quoted did not undertake to correct errors occurring in the procedure under which the bonds were issued. Its purpose was to deal with claims which were to be paid from the proceeds of the bonds, and which had been held invalid in the first *Orvis case,* and the act of June 6, 1935, undertook to make them legal obligations of the district. In other words, it undertook to make valid those claims incurred in excess of the statutory limit

so that they would furnish a basis of liability against the district and thus support the issuance of the bonds. The act was not, as is contended by plaintiffs, one dealing solely with the statutory debt limitation. It directs that where service or material has been furnished a school district and the same has been paid from the proceeds of bonds issued by the district, such payment shall be deemed a validation of the claims notwithstanding they were incurred in violation of the statutory debt limit. Section 10 of article IX of the constitution prohibits the General Assembly from imposing taxes upon municipal corporations and the provisions of the Act of June 6, 1935, have that effect when applied to the facts of this case. It is the imposition of a taxable liability upon the property in the district to pay claims which were otherwise invalid. We reaffirm the reasoning of the opinion of the second *Orvis case* and adhere to the conclusion there announced that the so-called validating act of June 6, 1935, is unconstitutional.

As alternative relief, plaintiff contends that if the bonds were invalid they have a right to recover the amount paid for the bonds in an action of assumpsit for money had and received. The specific question is as to whether or not the circumstances under which the bonds were issued and sold are sufficient to raise an implied contract on the part of the defendant to repay the money which it obtained through the sale of the bonds. This contention calls for application of the distinction between an irregular exercise of power and a step taken where there is an entire absence of such power. In 38 American Jurisprudence, page 196, it is said: "If a municipal corporation is without power to enter into an express contract in relation to a particular subject, it is equally without power to bind itself upon implied contract as to the same subject by any act of its officers, agents, or employees. Hence, the corporation ordinarily can not be held upon an implied contract to pay the reasonable value of property received or

services rendered under an express contract which was beyond the scope of its powers to enter into."

The validity of the bonds in question rests upon the validity of the claims which were paid from the proceeds of the sale of the bonds. The defendant was authorized by a vote of the people of the district to build a school-house. The proposition as submitted at the election contained no restrictions as to the amount but the power arising out of such authorization was not unlimited. The statute which prohibited the district from becoming indebted in any manner or for any purpose in excess of 2½ per cent of the assessed valuation was a restriction upon the power of the board to act. When indebtedness was incurred in excess of that limit it was, as to such excess, an act without power to sustain it. Had there been a failure to observe and follow some of the provisions of the statute as to contracting indebtedness and issuing bonds within the limit, that would have been an irregular exercise of the power, but when the defendant elected to go directly into the face of the statute and incur indebtedness in amounts prohibited by it, it was acting without power. Under such circumstances, the law will not supply the fiction of a promise to repay the money it has so received.

The statutory limitation of indebtedness was enacted in the interests of the taxpayers residing within the boundaries of the various municipalities. They were entitled to the protection of all constitutional and statutory restrictions as to limits of indebtedness. If the officers of a municipality may contract debts in excess of the statutory limit, borrow money to pay them and then become liable in an action for money had and received, the very purpose for which the statute was enacted has been defeated. One dealing with a municipal corporation is chargeable with notice of its powers and limitations and if he purchases bonds the proceeds of which are to be applied to a purpose prohibited by statute, he cannot, when the bonds have been

declared illegal, sustain an action for money had and received. For cases concerning liability of municipalities for money received by them for unlawfully issued instruments of indebtedness and the distinction made, see annotation in 7 A. L. R. 353.

Plaintiffs contend that the doctrine of equitable subrogation should be applied as to certain claims which were paid by the proceeds from the sale of the bonds. The evidence shows that the bonds were sold and delivered May 14, 1931, to H. C. Speer & Sons Company, dealers in municipal bonds. They were to bear interest at 5½ per cent per annum and were sold by defendant to Speer & Sons at par plus accrued interest. Within a few days thereafter, Speer & Sons resold the bonds on the basis of about 4½ per cent, thus yielding a profit to the original purchasers.

It is well settled that a mere stranger or volunteer can not, by paying a debt for which another is bound, be subrogated to the creditor's rights in respect to the security given by the real debtor. But if the person who pays the debt is compelled to pay for the protection of his own interest and rights, then the substitution should be made. (*Bennett* v. *Chandler*, 199 Ill. 97; *Hough* v. *Aetna Life Ins. Co.* 57 Ill. 318.) In the *Chandler case* it was said that "a stranger within the meaning of this rule is not necessarily one, who has had nothing to do with the transaction out of which the debt grew. Anyone, who is under no legal obligation or liability to pay the debt, is a stranger, and, if he pays the debt, a mere volunteer." Under the principles announced in the foregoing cases, it is obvious that plaintiffs are not entitled to be subrogated to the rights of the various creditors whose claims were paid from the proceeds of the sale of the bonds.

The defendant included in the total for which bonds were issued two claims of the Fox Lake State Bank aggregating $956.32. After the bonds were sold these two

claims were paid from the proceeds. Thereafter it was determined that no such claims existed and the bank repaid the money to the defendant. Defendant alleges in its counterclaim that this balance is in the hands of the school treasurer and is included in the total of $12,000 for which it asks directions as to disbursement. The proceeds of the bonds are directly traceable to this sum and, by application of well-established principles of equity, the sum belongs to plaintiffs. It was paid to the defendant for bonds on a mistake of fact and it should be repaid to plaintiffs.

Defendant asked for a refund of the amount of interest it paid plaintiffs from 1931 to and including September 1, 1939. As previously noted, $3025 of the interest was paid in settlement of the judgment taken in the Federal court and as to the payment of that money, that judgment would be conclusive against the defendant. As to the other items of interest, there is no evidence that the defendant paid any of them by mistake of fact or through fraudulent representations. Under such circumstances, the money will be deemed to have been voluntarily paid and there is no right of recovery. In *Village of Morgan Park* v. *Knopf,* 199 Ill. 444, it was held that the rule that money paid under mistake of law, there being no fraud or mistake of fact, cannot be recovered back applies to municipal corporations as well as to individuals. See, also, *People* v. *Foster,* 133 Ill. 496.

As a result of these conclusions, bonds to the amount of $10,701.51 are valid, binding obligations of the district and subject to the payments of interest and maturities as stated in the bonds. The fifty-four bonds held by the plaintiffs and the Unity of Bohemian Ladies should be reduced proportionately to said amount. The plaintiffs and the Unity of Bohemian Ladies should be reimbursed for the $956.32, which should be paid proportionately to their respective interests. All other relief asked by plaintiffs should

be denied. The amounts collected by bond tax levies and remaining in the treasury should be applied proportionately on the bonds found to be valid and interest thereon.

For the reasons assigned, the judgments of the circuit court are reversed and the cause remanded, with directions to proceed in accordance with the views herein expressed.

*Reversed and remanded, with directions.*